UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-cv-00110-MOC-DSC

| | | |
|---|---|---|
| **RODGERS BUILDERS, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **LEXINGTON INSURANCE COMPANY,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on the parties' Cross Motions for Summary Judgment (##12, 14), which have been fully briefed and are ripe for review. The court heard oral arguments on these matters on February 10, 2016. Having considered the motions, reviewed the pleadings, and considered the arguments of counsel, the court enters the following findings, conclusion, and Order.

## FINDINGS AND CONCLUSIONS

### I.   FACTUAL BACKGROUND

The facts of this case are as follows. In 2011, Rodgers Builders, Inc. ("RBI" or "Plaintiff") acted as the general contractor on a construction project in downtown Charlotte, North Carolina involving the renovation of a four-story commercial building. See (Pl. Exhibit A (#13-2), 30(b)(6) Deposition of RBI via Seth Spurlock, pp. 9-10). The owner of the project is the non-profit company Foundation for the Carolinas ("FFTC"); the renovated building now serves as FFTC's headquarters. Id. The highest story of the building, the fourth floor, does not extend across the entire third floor and thus, there is a small roof located on top of one section of the

third floor, commonly referred to as the "low roof." Id. at p. 15. This low roof was to be renovated to become a functional space, to include a sculpture garden. Id. In order to renovate this low roof, all of the existing HVAC equipment and related objects located on that low roof had to be demolished and removed. Id. at p. 39-43. The HVAC equipment was seated on a total of eight rectangular platforms that were grouped in pairs; these platforms are commonly referred to as "roof curbs" and are permanently attached to the roof decking of the low roof. Id.; Pl. Exhibit B (#13-3) (photos of roof curbs before demolition); Pl. Exhibit E (#13-6), Deposition of Daniel Pleasants, p.53). The top layer of the low roof is constructed of a single ply rubber membrane, which is weatherproofing material that prevents water from entering the interior of the building through the low roof. See (Pl. Exhibit D (#13-5), Deposition of Richard Moore, P.E., p. 69; Exhibit C (#13-4), Deposition of Chad Drake, pp. 24-25). Naturally, if there are any holes in the membrane, it is not watertight, and water can enter the interior of the building through those holes. See (Pleasants Dep. at pp. 23-24). The roof's rubber membrane did not extend underneath the roof curbs. See (Drake Dep. at p. 23).

Plaintiff subcontracted the demolition of various items on the renovation project to D.H. Griffin Wrecking Company ("DHG"). See id. at p. 30. DHG's scope of work included the demolition of the roof curbs on the low roof and partial demolition of a fourth floor exterior wall that was located next to the low roof. Id.; (30(b)(6) Dep. of RBI via Spurlock at p. 44). Between June 8 and 10, 2011, DHG created a partial opening in the fourth floor exterior wall located next to the low roof. See (Pleasants Dep. at pp.42-44). Following the completion of that work, a large tarp was installed over that opening to protect it from rain; RBI then assumed responsibility for making sure that tarp was secure at the end of each day. See (Pl. Exhibit G (#13-8), 30(b)(6)

Deposition of RBI via Brent Gildberg, at pp. 28-30). That tarp remained in place every day after June 10, 2011. Id. at p. 92-93.

On June 20 and 21, 2011, DHG demolished the roof curbs. See (Pleasants Dep. at pp. 53-54). Once DHG completed that work, there were a total of eight large rectangular holes in the rubber membrane of the low roof. Id. Thus, because of these eight holes in the rubber membrane, the membrane was not completely water tight. When DHG left the project site on June 21, 2011, the holes in the low roof created by the demolition of the roof curbs were left unprotected. See ((30(b)(6) Gildberg Dep. at pp. 51-52). DHG Superintendent Daniel Pleasants states that he had conversations with Plaintiff's Senior Field Coordinator, Brent Gildberg, about the demolition work on the roof curbs around the time that work took place, and that he understood that Plaintiff would be responsible for covering any holes in the roof. See Pleasants Aff. (#14-7) at ¶ 3. He also states that he told Gildberg at approximately 3:30 p.m. on June 21, 2011 that DHG's work was complete, and left the site soon thereafter. Id. at ¶ 4. Gildberg states that although he performed a "walk through" to review DHG's work on June 21, 2011, he did not see any roof penetrations. Id. at pp.70, 84-85. The tarp covering the opening in the fourth floor wall was in place. Id. at pp. 94-95.

On the night of June 21, 2011 and the early morning hours of June 22, 2011, a total of .54 inches of rain fell. See (Pl. Exhibit H (#13-9), Certified NOAA data for June, 2011, p.2). When RBI arrived at the project the morning of June 22, 2011, RBI discovered a substantial amount of standing water and water damage inside the building. See (30(b)(6) Spurlock Dep. at pp. 91-92). The water intrusion damaged work located on the mezzanine and second floors of the project. See (Pl. Exhibit I (#13-10), RBI's responses to Lexington's Interrogatories, Interrogatory 6).

Prior to that "rain event" or "loss event," the space was essentially move-in ready. See (Pl. Exhibit J (#13-11), 30(b)(6) Deposition of Lexington, pp.108-109). The rain event damaged the completed walls, insulation to those walls, completed ceilings, carpet, electrical work, lighting fixtures, millwork, and portions of the elevator system. See (Pl. Exhibit I (#13-10), RBI's responses to Lexington's Interrogatories, Interrogatory 6).

On the same day that RBI discovered the damage, Plaintiff summoned subcontractor Johnson's Roofing Service ("Johnson" or "Johnson's Roofing") to the project site and paid them to seal the areas where water could have infiltrated the building. See (Def. Ex. H (#14-8), 30(b)(6) Gildberg at pp. 59-60; Def. Ex. K (#14-11), June 27, 2011 Letter of Rodgers Builders' Risk Manager, William Satterfield; Def. Exhibit L (#14-12), Rodgers Builders' First Report of Loss, June 28, 2011). Plaintiff has offered evidence showing that the repairs done on the roof the day the loss was discovered consisted of only patchwork over the holes created by the demolished roof curbs, not a complete re-sealing of the roof. See (Pl. Exhibit CC (#20-3), 30(b)(6) Deposition of RBI via Seth Spurlock, pp.99-100; Pl. Exhibit EE (#30-5), Moore Dep. p.86, 109; Moore Dep. Exhibits 28, 31-35 (#13-5) (photos of the low roof where Moore drew red rectangles around the patches that were installed to re-seal the holes from the demolished curbs; Pl. Exhibit U (#13-22), photos of same deposition exhibits before they were marked by Moore).

Plaintiff reported the loss to FFTC's representative, Laura Smith, the same day of the loss (June 22). (Pl. Exhibit N (#13-15), 30(b)(6) Deposition of RBI via William Myer, p.70). On June 23, 2011, RBI notified DHG in writing of the loss. See (Pl. Exhibit O (#13-16), June 23, 2011 email from Josh Norris to DHG). Additionally, Defendant stated in its 30(b)(6) deposition that it received notice from someone "the day after the rain event." See (Pl. Exhibit W (#18-3), 30(b)(6)

Deposition of Lexington, p.95). On June 27, 2011, Plaintiff sent a demand letter to DHG putting it on notice of Plaintiff's intent to seek coverage under DHG's liability policy (provided by Defendant) as an additional insured. <u>See</u> (Pl. Exhibit Q (#13-18), June 27, 2011 letter from William Satterfield to DHG). Defendant's insurance agent was copied on that letter. <u>Id.</u> Also on June 27, 2011, Mr. Satterfield called DHG employee Chad Drake and asked him to put DHG's carrier on notice of a claim. (Pl. Exhibit P (#13-17), June 27, 2011 memo from Chad Drake). DHG employees inspected the loss at the site on June 23 and June 27. <u>Id.</u>

Following the loss event, Plaintiff submitted a claim to its commercial general liability insurer, Travelers Property Casualty Company of America, for the amount Plaintiff's subcontractors charged to repair the damages caused by the loss event. <u>See</u> (Def. Exhibit O (#14-18), Deposition of RBI Risk Manager William Satterfield, p. 118-19, 122; Def. Exhibit P (#14-19) Deposition RBI Project Manager William Myer, pp. 88-89). Travelers then issued a check to Plaintiff for $271,987.73 on March 5, 2012. <u>See id.</u> at p. 125; Def. Exhibit Q (#14-20).

As the facts relate to Plaintiff's notice of the loss event to Defendant, on July 14, 2011, William Satterfield of RBI sent two emails to William Brewer, a claim adjuster with Defendant regarding this claim, and left Mr. Brewer a voicemail message. <u>See</u> (Pl. (#13-19) Exhibit R). On July 29, 2011, Plaintiff sent another demand letter to Defendant asking for coverage "under the additional insured obligations." <u>See</u> (Pl. Exhibit S (#13-20)).

### A. *<u>Plaintiff's Subcontract with DHG</u>*

DHG's subcontract with Plaintiff contained the following key provisions:

> 1. Pursuant to section 5.3.3 of that contract, DHG agreed to "coordinate Subcontractor's Work with the work of Contractor and others."

> 2. Pursuant to section 5.8, DHG agreed to "take all necessary precautions to

properly protect Subcontractor's Work and any other existing Work or
improvements from damage caused by Subcontractor's operations."

3. Attachment C to that contract, item 3, DHG agreed "to protect work at the end
of each workday."

4. Pursuant to section 5.13 of the contract, DHG agreed that every "portion of
Subcontractor's Work shall be executed in strict accordance with the Contract
Documents in the most sound, workmanlike, and substantial manner."

5. Finally, pursuant to section 8.6 and Attachment A to that contract, DHG agreed
to procure additional insured coverage for RBI for ongoing and completed
operations with said insurance providing primary coverage for RBI.

See (#13-7).

### B. *The Insurance Policy at Issue*

Defendant Lexington Insurance Company ("Lexington"), a subsidiary of AIG, issued a

commercial general liability policy to DHG, policy number 023462650, with a policy period of

May 10, 2011 through May 10, 2012 (hereinafter the "Lexington Policy") (#14-6). The policy

limits are one million dollars ($1,000,000) per occurrence. Id. at p. 4. There are several relevant

provisions of the policy to the instant lawsuit. First, Plaintiff argues that it comes within the

scope of the policy by virtue of the "additional insured" provision. To that end, the Lexington

Policy contains the following provision:

**Additional Insured - Owners, Lessees or Contractors - Scheduled Person or
Organization**

A. Section II - Who Is An Insured is amended to include as an insured the person or
organization shown in the Schedule, but only with respect to liability *arising out of*
your[1] ongoing operations performed for that insured.

Id. at p. 46 (emphasis added). This "additional insured endorsement" provides coverage "where

---

1 "Your" within the meaning of this contract "refer[s] to the Named Insured [DHG] shown in the Declarations, and
any other person or organization qualifying as a Named Insured under this policy." See Lexington Policy (#14-6) at
p. 6.

required by written contract." Id. Plaintiff notes that Attachment A to its subcontract with DHG specifically requires DHG to provide additional insured coverage for Plaintiff for ongoing and completed operations, and makes specific reference to this particular endorsement form. See (#13-7), Subcontract between RBI and DHG, p.15 (requiring that "Subcontractor shall provide and maintain in force at all times during the performance of this Agreement the following insurance: $1,000,000 per occurrence combined for bodily injury or property damage…"). Further, Lexington's policy contains endorsement #014, which states Lexington's policy "shall be primary insurance" for the additional insured "with respect to any claim, loss or liability arising out of the Named Insured's operations." See Lexington Policy (#14-6 at p.55).

Another provision of the Lexington Policy describes in general terms the scope of coverage. Under the "Insuring Agreement" contained in Section I, Coverage A of Lexington's policy, the policy states that Lexington will pay sums that "the insured becomes legally obligated to pay as damages because of…'property damage' to which this insurance applies." Id. at p. 6. Elsewhere in that same section, the policy requires that the "property damage" be caused by an "occurrence" that takes place in the coverage territory during the policy period. Id.

The Lexington Policy also states the duties of the insured in the event of an "occurrence," as follows:

> **SECTION V – CONDITIONS**
>
> …
>
> 2.    **Duties In The Event of Occurrence, Offense, Claim or Suit**
>
>     a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

\*     \*     \*

d. No insured will, <u>except at that insured's own cost</u>, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

<u>Id.</u> at p. 25 (emphasis added).

Finally, the policy also contains an exclusion under the Lexington Policy's "Damage to Impaired Property." That exclusion provides:

**2. Exclusions**

This insurance does not apply to:
…

**m. Damage to Impaired Property Or Property Not Physically Injured**
"Property damage"[2] to "impaired property"[3] or property that has not been physically inured, arising out of:
(1) A . . . deficiency [or] inadequacy in . . . "your work"; or
(2) A . . . failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

<u>Id.</u> at p. 11.

---

2 "Property Damage" is defined as: "(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it." (#14-6) at p. 24.

3 "Impaired Property" is defined as "tangible property, other than 'your product' or 'your work' that cannot be used or is less useful because (a) [i]t incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or (b) [y]ou have failed to fulfill the terms of a contract or agreement, if such property can be restored to use by the repair, replacement, adjustment or removal of 'your product' or 'your work' or your fulfilling the terms of the contract or agreement." <u>Id.</u> at p. 21.

At oral argument, the court discussed with the parties their contentions as to who is ultimately liable for the damage caused to the building in this case, though the court notes that its role in this case is to determine coverage of an insurance policy, not ultimate liability for the loss. The evidence of record shows that immediately following the loss event, Plaintiff placed blame on both DHG and Johnson's Roofing for the financial losses incurred. For example, on June 23, 2011, Joshua Norris, Assistant Project Manager for Plaintiff, stated in an e-mail to representatives of Johnson's Roofing that water infiltrated the building's roof because of Johnson's negligence. See (Def. Exhibit M, Joshua Norris e-mail, June 23, 2011). Plaintiff later obtained $10,000 from Johnson to cover damages caused by the Loss Event. See (Def. Ex. B (#14-2), Rodgers Builders Answer to Interrogatory No. 9). The June 27, 2011 letter from Plaintiff to DHG right after the loss event indicates that Plaintiff also placed some blame for the loss on DHG, stating that "[RBI] is placing [DHG] on notice [for defense indemnification and additional insured obligations] because of [DHG]'s responsibility to coordinate with other trades when making a roof opening." See (#14-11) at p. 1. Similarly, the July 29, 2011 letter from Plaintiff to Defendant's claim adjuster states several times that DHG is responsible for the loss due to an alleged breach of contract, asserting as follows:

> As a result of DH Griffin's failure to coordinate with other trades and protect their work, rainwater infiltrated the roof and traveled into the building…DH Griffin is financially responsible for this loss due to their breach of several contract provisions contained within the Subcontract Agreement between DH Griffin and Rodgers Builders.

> These breaches include:
> 1. Failure to coordinate their work with Rodgers and Johnson's Roofing Service…with regard to sealing the roof penetration
> 2. Failure to Protect their work at the end of each workday.

See (Pl. Ex. S (#13-20). Plaintiff reiterated this argument several months later by virtue of a November 21, 2011 letter to Defendant's claim adjuster. See (Def. Ex. R (#14-21). Plaintiff stated therein that DHG breached its contract obligation to "protect its work at the end of each workday" when DHG "failed to address the roof penetration before leaving the jobsite" and also breached its obligation to coordinate its work with RBI. Id. RBI then contended:

> DH Griffin is financially responsible for this loss due to their breach of the contract provisions contained within the Subcontract Agreement. Because DH Griffin is responsible for this loss, Rodgers must request indemnification under the additional insured obligation under [the subcontract agreement].

Id.

Since the outset of this litigation, however, by its briefing and oral arguments, Plaintiff adamantly asserts that it alone is responsible for the damage. In support of this contention, Plaintiff cites testimony from Defendant's expert, Richard Moore, who explained in great detail in his deposition and expert report how RBI failed to inspect DHG's work, coordinate DHG's work, and protect DHG's work.[4] See (Pl. Ex. D (#13-5); Pl. Ex. M (#13-14)). Additionally, Defendant's 30(b)(6) representative stated at deposition that RBI, not DHG, was at fault for the loss. (#13-11, Exhibit J, 30(b)(6) Deposition of Lexington, p.58). DHG (which is no longer a party to this lawsuit) also averred that RBI alone is responsible for the loss event. See (Pl. Ex. T (#13-21), DHG's Responses to Plaintiff's First Set of Interrogatories, Interrogatory 7). However,

---

4 Moore stated in his expert report, "RBI failed to recognize the potential leak risk associated with the demolition of the roof curbs and failed to notice any openings in the low roof as part of RBI's daily inspection of the site before leaving for the night." (Exhibit M, Richard Moore, P.E.'s expert report, p.6-1, section 6.1). Moore also stated "it doesn't appear that RBI was successful in getting the roofer and demolition subcontractor at a coordinating meeting for the Legacy Hall work at the same time. This coordination failure by RBI was a key element in the poor communication among the general contractor, roofer, and demolition subcontractor resulting in no roof patches at demolished curbs the night of June 21, 2011." (Id. at p.6-2, section 6.3).

RBI's 30(b)(6) deposition representative testified that both RBI and DHG were at fault for this accident. (Pl. Ex. G (#13- 8), 30(b)(6) Deposition of RBI via Gildberg, p.70; pp.84-85). Plaintiff has admitted the following facts related to its assertion that it, not DHG, was responsible for the accident. <u>See, e.g.</u> (Pl. Mot. Sum. J (#13 at p. 7):

- DHG was hired to remove roof curbs and not to patch holes in roofs or ensure water-tightness. <u>See</u> Def. Mot. Summ. Judg. (#14), Statement of Facts ("SOF"), ¶¶ 4, 18.
- If roof penetrations did exist, sub-contractor Johnson Roofing Service– not DHG – was responsible for their patching and protection. <u>Id.</u> at ¶ 18.
- When demolition work created openings in the building (i.e. for the fourth floor wall), Plaintiff – not DHG – was responsible for protecting those openings. <u>See</u> Pl. Ex. G, 30(b)(6) Dep. via Gildberg (#13-8) at p. 93-94.
- On the day preceding and the day of the Loss Event, Rodgers Builders inspected DHG's work, did not observe any holes or penetrations to the building's roof, and even helped DHG demobilize from the project site. Def. Mot. Summary Judgment, (#14) SOF at ¶ 11.

On March 5, 2014, Plaintiff filed its Complaint for Declaratory Relief in state court (#1-1), seeking a declaration that Defendant is required to provide full coverage to Plaintiff under the Lexington Policy, and that Defendant is required to fully reimburse Plaintiff for the loss, including costs and interest. On May 5, 2014, Defendant served its Answer to the Complaint and also included a Counterclaim for Declaratory Relief, seeking a declaration that the Lexington Policy does not afford coverage to Plaintiff for damages incurred as a result of the loss event, and that Defendant is not obligated to indemnify Plaintiff for any amount. (#1-2, p.1). On March 5, 2015, Defendant removed the case and the parties thereafter filed the cross-motions for summary judgment now before the court.

The court notes that despite the somewhat conflicting evidence in the record as to liability in this case, it is not the role of the court to conclusively determine which of the several entities involved in the renovation project was at fault for the loss, or to apportion liability amongst them. The role of the court is only to determine whether or not Plaintiff is an "additional insured"

and ultimately entitled to coverage under the Lexington Policy.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party.  That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586

(2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 252.  When, as here, the court reviews cross-motions for summary judgment, "each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." <u>Mellen v. Bunting</u>, 327 F.3d 355, 363 (4th Cir. 2003) (citing <u>Rossignol v. Voorhaar,</u> 316 F.3d 516, 523 (4th Cir. 2003)).

Additionally, as both parties in this matter seek declaratory judgments pursuant to N.C. Gen. Stat. Ann. § 1-253, <u>see</u> (## 1-1;14-22), determining whether Plaintiff is entitled to recover from Defendant the amount of the loss at issue, the court notes that "[d]eclaratory judgment is appropriate for the construction of insurance contracts and in determining the extent of coverage under an insurance policy." <u>Hobson Const. Co. v. Great Am. Ins. Co.</u>, 322 S.E.2d 632, 634 (N.C. Ct. App. 1984) (citing <u>Insurance Co. v. Simmons, Inc.</u>, 128 S.W.2d 19 (N.C. 1962). <u>See also</u> <u>id.</u> at 634 ("A declaratory judgment action is designed to establish in an expeditious fashion the rights, duties and liabilities of parties in situations usually involving an issue of law or the construction of a document where the facts involved are largely undisputed. Its purpose is to settle uncertainty in regard to the rights and status of parties where there exists a real controversy of a justiciable nature.").

## III.    DISCUSSION

By the instant motions, Plaintiff asks the court for a declaratory judgment proclaiming that Plaintiff is entitled to full coverage and indemnity under Defendant's liability policy; Defendant seeks an opposite ruling. Resolution of the parties' cross-motions for summary judgment and

cross-claims for declaratory judgment requires this court to interpret the contract at issue. Under North Carolina law, the insured "has the burden of bringing itself within the insuring language of the policy. Once it has been determined that the insuring language embraces the particular claim or injury, the burden then shifts to the insurer to prove that a policy exclusion excepts the particular injury from coverage." Hobson Const. Co., Inc. v. Great American Ins. Co., 322 S.E.2d 632, 635 (N.C. Ct. App. 1984). The court notes that "[w]hile policy provisions excluding coverage are strictly construed in favor of the insured, those provisions which extend coverage 'must be construed liberally so as to provide coverage, whenever possible by reasonable construction.'" City of Greenville v. Haywood, 502 S.E.2d 430, 433 (N.C. Ct. App. 1998) (quoting State Capital Insurance Co. v. Nationwide Mutual Insurance Co., 350 S.E.2d 66, 68 (N.C. 1986)). Additionally, "an insurance policy is a contract between the parties which must be construed and enforced according to its terms." Id. at 432-33 (quoting Graham v. James F. Jackson Assoc., Inc., 352 S.E.2d 878, 880 (N.C. Ct. App. 1987)). The court will address the parties' disputed interpretations of the contract provisions at issue seriatim.

### 1. Whether Plaintiff is an "additional insured" under the Lexington Policy

The court first must determine whether Plaintiff falls within the scope of the Lexington Policy as an "additional insured." The parties agree that pursuant to the additional insured endorsement in the policy, Plaintiff is an additional insured if liability "arises out of" DHG's work. The contract does not provide a definition for "arises out of." See (#14-6 at p. 20) (providing definitions in alphabetical order and not providing one for the term at issue). The North Carolina Court of Appeals has held that "when, as here, the policy does not define the phrase "arising out of," we must read the phrase in accordance with 'the ordinary meaning of

[that phrase].'" <u>Pulte Home Corp. v. Am. S. Ins. Co.</u>, 647 S.E.2d 614, 618 (N.C. Ct. App. 2007) (quoting <u>City of Greenville v. Haywood</u>, 502 S.E.2d 430, 434 (N.C. Ct. App. 1998)). Additionally, "[i]f used to extend, rather than exclude, coverage, our courts have broadly construed the phrase 'arising out of' to require a simple causal nexus, and not causation rising to the level of proximate cause." <u>Id.</u> (internal citations and quotations omitted). Such "sufficient nexus exists if that liability is 'a natural and reasonable incident or consequence of' those operations.'" <u>Id.</u> (quoting <u>State Capital Ins. Co. v. Nationwide Mut. Ins. Co.</u>, 350 S.E.2d 66, 70 (N.C. 1986)). In <u>Pulte</u>, the North Carolina Court of Appeals also found "persuasive those decisions from other jurisdictions where similar endorsement language contained within a commercial general liability policy has been interpreted to provide coverage to the additional insured even for liability arising from the additional insured's own independent negligence." <u>Id.</u> at 619 (collecting non-binding cases).

Applying those standards to this case, it is apparent that DHG's demolition work and the creation of the holes in the roof membrane are causally related to the water damage in the building. While Defendant attempts to raise questions about whether the property damage was actually caused by the eight holes in the roof membrane, the court finds that the evidence of record shows that the damage to the building interior was caused, at least in part, by the holes left by the demolition work performed by DHG. Daniel Pleasants, the DHG foreman who was present for and supervised the demolition of the roof curbs at issue and actually saw the penetrations, testified that DHG's demolition of the roof curbs created eight large rectangular holes in the rubber membrane. <u>See</u> (Pl. Ex. E (#13-6), Deposition of Daniel Pleasants, pp. 22-23, 23-24, 29, 54). Additionally, Defendant's own expert, Richard Moore, P.E., testified when asked

in his deposition, "Q. The two likely sources of water intrusion that caused the property damage at issue are penetrations through the rubber membrane on the low roof and the demoed wall on the fourth floor; is that correct? A. That's right." See (Pl. Exhibit EE (#20-5), Deposition of Richard Moore, P.E., p.80; Pl. Ex. D (#13-5), Deposition of Richard Moore, P.E., pp.128, 141-142, 144). Finally, Defendant's 30(b)(6) representative Paul Renaud also testified that through expert testimony, Defendant agreed that the property damage at issue came, in part if not entirely, from water entering the building through the demolished roof curbs. (Pl. Exhibit DD, 30(b)(6) Deposition of Lexington, pp.129-130). Consequently, there is no dispute that water entered the building at least partially due to the holes created by DHG.

Here, DHG's work was performed pursuant to its subcontract with Plaintiff. The holes in the roof membrane created by DHG's work allowed water to enter the building, which in turn caused damage to the building interior. Plaintiff's liability is "naturally and reasonably incident," or causally connected to, DHG's demolition operations. See Pulte Home Corp. v. Am. S. Ins. Co., 647 S.E.2d 614, 618 (N.C. Ct. App. 2007). The court finds that given the precedent calling for "a liberal construction" of the phrase "arising out of" where it is undefined in the contract, see id., Plaintiff qualifies as an "additional insured" because there is a sufficient causal nexus between DHG leaving holes in the roof membrane, Plaintiff's failure to cover up those holes, and the resulting damage. Accordingly, the court will address Defendant's remaining arguments as to whether any other provisions of the Lexington Policy preclude coverage.

### 2. Whether Plaintiff incurred a "legal obligation" to pay damages to a third party

Defendant argues that coverage is precluded because Plaintiff has failed to demonstrate that it incurred a "legal obligation" to pay damages to a third party, as required by the policy. See

(Lexington Policy (#14-6) at p. 6). "To be 'legally entitled to recover damages, a plaintiff must not only have a cause of action but a remedy by which he can reduce his right to damages to judgment." N. Carolina Farm Bureau Mut. Ins. Co. v. Smith, 743 S.E.2d 647, 649 (N.C. Ct. App. 2013) (quoting Brown v. Lumbermens Mut. Cas. Co., 204 S.E.2d 829, 833 (N.C. 1974)). Defendant first appeared to argue by briefing that Plaintiff never incurred a "legal obligation" to pay for the damages because a legal claim was never levied, suit was never filed, nor was a judgment ever obtained against Plaintiff for these damages. Defendant then conceded at oral argument that while a "legal obligation" does not require that any papers be filed in court in relation to a lawsuit, some sort of written or verbal communication constituting a demand by the project owner should be required.

   Plaintiff argues that Defendant's own paperwork indicates that Plaintiff incurred a legal obligation to pay for the damage. Plaintiff notes that upon receipt of Plaintiff's June 27, 2011 letter to DHG requesting defense and indemnity, Defendant's insurance agent completed an ACORD form entitled "General Liability Notice of Occurrence/Claim." (#14-12). The "Description of Occurrence" section of that form states, "Insured received letter from General Contractor, Rodgers Builders as tender for water damage to clmt (sic) property during job projec (sic)." Id. In the "Injured/Property Damaged" section, the form provides for "Foundation/Carolina Charlotte NC." Also, under "Remarks," it states "see [June 27, 2011] tender letter as presented by Rodgers Builders." Plaintiff argues that this documentation proves that FFTC was the claimant for the recovery of damaged property. The court agrees. Plaintiff also argues that the June 27, 2011 letter from RBI to DHG, see (#14-11), which contains "defense, indemnity and additional insured obligations" language, shows a claim was being

made by FFTC against Plaintiff. Plaintiff also notes that Defendant's own expert explained in detail at his deposition and in his report how Plaintiff was responsible for the loss that occurred, and notes that Defendant's 30(b)(6) representative stated that Plaintiff was at fault for the damages. <u>See</u> (Pl. Exhibit J (30(b)(6) deposition of Lexington, p. 58). Plaintiff thus argues that as the general contractor causing the loss, it was legally liable to the owner for the resulting damages, as it is the entity ultimately responsible for delivering a satisfactory and complete renovation. The court agrees that such responsibility lies with the general contractor. <u>See Pavarini Const. Co. v. Cont'l Ins. Co.</u>, 304 A.D.2d 501, 502, 759 N.Y.S.2d 56, 57 (2003) ("As general contractor, Pavarini was responsible for the entire project and all work done by Pavarini's subcontractor was done on Pavarini's behalf.") (citing <u>Basil Dev. Corp. v. Gen. Acc. Ins. Co.</u>, 89 N.Y.2d 1057, 659 N.Y.S.2d 828, 681 N.E.2d 1274)); <u>Uvino v. Harleysville Worcester Ins. Co.</u>, No. 13 CIV. 4004 NRB, 2015 WL 925940, at *5 (S.D.N.Y. Mar. 4, 2015) (collecting cases).

Defendant argues that neither of these documents constitute proof of a "cause of action" by FFTC or any other party, nor a "remedy which [FFTC or any other party] could reduce its right to judgment." In a broader sense, Defendant also contends that a general contractor should not volunteer to make a payment for damage without receiving some sort of demand from the project owner. As Defendant notes, for "additional insured" policies such as those at issue here, to require a subcontractor's insurance policy to cover a general contractor's errors without any approval or inspection by subcontractor's insurer could force that insurance company to pay claims for which it had no involvement or approval. On the other hand, the court finds significant merit in Plaintiff's argument that common sense indicates that FFTC would have a cause of action against Plaintiff—the general contractor for the project—for the loss here. Plaintiff has

claimed responsibility for the loss by virtue of its failure to notice holes in the roof membrane while performing a walk-through, cover such holes, coordinate with the subcontractors to protect the holes, and prevent leaks into the interior of a nearly-completed renovation space. Thus, to find that Plaintiff was not "legally obligated" to pay for the damage simply because it claimed responsibility before being forced into a contentious dispute with the project owner seems unjust. Namely, such a finding would encourage general contractors such as Plaintiff to deny liability for damage that they caused until faced with the threat of litigation or other adverse action by a project owner. Ultimately, the court finds Plaintiff's argument to be more persuasive on this issue and finds that Plaintiff did indeed incur a legal obligation to pay for the property damage in this case. The language of the ACORD notice and the June 27, 2011 letter indicate that FFTC held Plaintiff responsible for the loss and the court finds that as the general contractor, Plaintiff was legally obligated to correct the damage.

### 3. Whether Plaintiff fulfilled its duties under the Lexington Policy

Defendant next argues that Plaintiff failed to comply with the Lexington Policy because it repaired the damages at issue without notifying Defendant of the loss event or providing Defendant an opportunity to inspect the alleged cause of loss. Defendant also claims that Plaintiff agreed to pay the cost of repairs without Lexington's consent, which violated the Lexington Policy's "Duties in the Event of Occurrence, Offense, Claim or Suit" provisions, including the voluntary payment clause.

Regarding the "duty to notify" argument, the Lexington Policy provides that "You must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." (#14-6 at p. 25). Plaintiff argues that the "you" here refers to DHG, not RBI, and that

Plaintiff is not required to comply with that term. <u>See</u> Lexington Policy (#14-6) at p. 6 (providing that "you" refers to the Name Insured on the contract). However, such argument essentially reads out any obligations that Plaintiff has as a covered entity under the insurance policy. In other words, equity demands that if Plaintiff wants to claim benefits of the policy, it should comply with its terms. Additionally, the court notes that North Carolina courts have required additional insureds to comply with all notice provisions in a commercial general liability policy. <u>See, e.g.,</u> <u>Pulte Home Corp.</u>, 647 S.E.2d at 618 (analyzing whether additional insured complied with the same provisions with which a named insured must comply.). Accordingly, the court finds that Plaintiff was obligated to comply with these provisions.

Plaintiff argues that if the provision applies, it notified Defendant of the loss by letter on June 27, 2011, just five days after the loss. (#14-11). Further, Defendant admitted by its 30(b)(6) deposition that it received notice of the loss "the day after the rain event," <u>see</u> (30(b)(6) Deposition of Renaud (#18-3) at p. 95), though it is unclear how or from whom Defendant received such notice. The court finds that given the undisputed testimony from Defendant's representative that one of its employees had notice of the loss the day after the rain event, Plaintiff satisfied its duty to inform Defendant "as soon as practicable" of the occurrence of the loss event. <u>See</u> (#14-6 at p. 25).

As to the "lack of consent" argument, the Lexington Policy requires that no insured will "voluntarily make a payment, assume any obligation, or incur any expense … without our consent." (#14-6 at p. 25). Plaintiff argues that because it was legally liable to the owner for damages resulting from this accident, its payments and repair work were not made voluntarily. It also argues that even if it violated the "lack of consent" provision, Lexington waived and is

estopped from relying on this condition by virtue of its failure to take any action to address the occurrence or even investigate the site. "It is well settled that an insurer may be found to have waived a provision or condition in an insurance policy which is for its own benefit." <u>Brandon v. Nationwide Mut. Fire Ins. Co.</u>, 271 S.E.2d 380, 383 (N.C. 1980). North Carolina courts have long held that "the breach of any condition in [an insurance] policy … may be waived by the insurer; and a waiver may be implied from the acts and conduct of the insurer after knowledge that such conditions have been broken." <u>Blue Bird Cab Co. v. Am. Fid. & Cas. Co.</u>, 15 S.E.2d 295, 301 (N.C. 1941). Under waiver, "an insurer waives a policy provision (which would have allowed avoidance of the policy) if at the time the policy is issued, the insurer has knowledge of existing conditions which would otherwise void the policy under the provision's terms." <u>U.S. Fid. & Guar. Co. v. Country Club of Johnston Cty., Inc.</u>, 458 S.E.2d 734, 740 (N.C. Ct. App. 1995) (citing <u>In re Appeal by McCrary</u>, 435 S.E.2d 359, 366 (N.C. Ct. App. 1993)). Similarly, an insurer may be estopped from denying coverage under an insurance policy if the insurer's "actions or silence when [it] ought to have spoken, intentionally or through culpable negligence, induce[s] [the insured] to believe ... coverage exist[s]" and the insured relies upon such belief to his or her detriment. <u>Id.</u>

As explained above, Defendant had notice of the loss the day after the rain event. The "repair work" performed on June 22, 2011—the day the water damage was discovered—merely involved patching the holes in the low roof, some sheet rock tear out, and initial water cleanup. <u>See</u> (Pl. Exhibit CC (#20-3), 30(b)(6) Deposition of RBI via Seth Spurlock, pp.99-100; Pl. Exhibit EE (#30-5), Moore Dep. p.86, 109; Moore Dep. Exhibits 28, 31-35 (#13-5)). The initial roofing patch work was done to protect against further damage from subsequent rain events. The

repairs to the mezzanine level and second floor, which are the only damages in this case, were repaired after Defendant was on notice of the loss. <u>See</u> (#18-5). For whatever reason, Defendant did not send any investigators, experts or adjusters to the site to investigate the loss or document the damages. <u>See</u> ((#18-3, 30(b)(6) Deposition of Lexington, pp. 29-30). Defendant did, however, have frequent and regular contact with Plaintiff during the months immediately following the loss by email, letter, phone calls, and conference calls with representatives of RBI, DHG, Travelers and Lexington. At no point during that time did Defendant object to any aspect of the repairs. <u>See</u> ((#18-7) (e-mails between RBI and Lexington). The evidence also confirms that Lexington, as part of its investigation into this claim, obtained "work orders" and "reviewed the damages presented." <u>See</u> (Pl. Exhibit W (#18-3), 30(b)(6) Deposition of Lexington, pp.40-41).

The court finds that while Plaintiff made repairs to the roof without "allowing" Defendant to inspect the damage or the holes in the roof, and then paid for the repairs without Defendant's consent, Defendant failed to send out investigators, never objected to the repairs, never asked Plaintiff to take a specific course of action, and ultimately denied Plaintiff's claim. Defendant conceded at the hearing that if it had been notified of the loss the day after the occurrence, which is an undisputed fact in the record, it would have been obligated to send out an insurance adjuster to inspect the site. Defendant made no such effort. As Defendant remained silent with regard to repairing the damage after being notified both of the loss event and Plaintiff's pursuit of additional insured coverage under the Lexington Policy, the court finds that Defendant waived any such requirement that Plaintiff obtain consent to make repairs to the building and is now estopped from asserting such requirement.

**4.  *Whether the Lexington Policy excludes the damage at issue.***

Finally, Defendant argues that the Lexington Policy excludes coverage for the type of

damages allowed under the Lexington Policy's "Damage to Impaired Property." As noted above,

under this exclusion, Lexington is not liable for any:

> 'Property damage' to 'impaired property' or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency [or] inadequacy … in … '[DHG's] work'; or
>
> (2) A delay or failure by [DHG] or anyone acting on [DHG's] behalf to perform a contract or agreement in accordance with its terms.

See (#14-6 at p. 11). "Property damage" is defined in the Policy as: "(a) Physical injury to

tangible property, including all resulting loss of use of that property…or (b) Loss of use of

tangible property that is not physically injured..." (#14-6) at p. 24. "Impaired property" is

defined as:

> tangible property … that cannot be used or is less useful because:
>
> (a) it incorporates … 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> (b) you have failed to fulfill the terms of a contract or agreement;
>
> If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.
>
> Id.

Physical injury to tangible property clearly occurred in this case. However, Plaintiff argues

that the damage was not to "impaired property." Here, the damage was to the interior of the FFTC

building, not DHG's work, and did not "incorporate" any of DHG's demolition work. The court

thus finds that the property damage was not to "impaired property" within the meaning of

subparagraph (a) of that definition. In order for subparagraph (b) to apply, DHG must have failed to fulfill the terms of a contract or agreement. Again, Plaintiff's repeated assertions in this lawsuit have been that it alone is responsible for the damage at issue. While there is evidence in the record that immediately following the loss event, Plaintiff tried to blame DHG for the damage and alleged that it breached its contract obligations, see, e.g., June 27, 2011 letter (#14-11), whether or not DHG breached its contract has not been presented as an issue for the court's resolution, and it by no means has been established as a conclusive fact in this litigation. Additionally, the court notes that the final modifying phrase of the definition indicates that the exclusion does not apply, as there is no evidence that the damaged property on the mezzanine level and second floor would have been "restored to use by the repair, replacement, adjustment or removal of 'DHG's product or work.'" The court thus finds that the damage is not to "impaired property" within the scope of subparagraph (b). Accordingly, the court finds that the "Damage to Impaired Property" exclusion is inapplicable.

## IV.    CONCLUSION

The court reiterates that the question presented in this case is whether the Lexington Policy provides "additional insured" coverage to Plaintiff for the damages that arose from the loss event. The court's holding is therefore limited to the applicable matter of contract interpretation. Ultimately, for the reasons explained herein, the court finds that Plaintiff qualifies as an Additional Insured under the Lexington Policy, and that no policy provision precludes Plaintiff from coverage. The court will therefore grant Plaintiff's Motion for Summary Judgment, deny Defendant's Motion for Summary Judgment, and enter Declaratory Judgment as stated below.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Summary Judgment (#12) is **GRANTED** and Defendant's Motion for Summary Judgment (#14) is **DENIED**.

**IT IS FURTHER ORDERED** that Declaratory Judgment is entered as follows: Plaintiff Rodgers Builders, Inc. is entitled to full coverage by Defendant Lexington Insurance Company by virtue of being an "Additional Insured" under the general liability policy issued to non-party D.H. Griffin.

Signed: March 10, 2016

Max O. Cogburn Jr.
United States District Judge